Estate of J. B. Davis, Cordelia Matthew Davis, Executrix v. Commissioner.
Estate of J. B. Davis v. Commissioner
Docket No. 6949.
United States Tax Court
1946 Tax Ct. Memo LEXIS 14; 5 T.C.M. (CCH) 1064; T.C.M. (RIA) 46287; December 11, 1946
A. W. Clapp, Esq., and Alex C. King, Esq., for the petitioner. Bernard D. Hathcock, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: By this preceeding petitioner seeks redetermination of a deficiency in estate tax in the amount of $13,487.25. J. B. Davis, hereinafter referred to as decedent, died on December 20, 1940. The principal question is whether the value of certain properties which decedent purported to transfer to a trust in 1927 is properly includible in decedent's gross estate. The other issues concern the valuation of 375 shares of stock of J. B. Davis & Company, Inc., returned at a value of $350 *15 per share, and so accepted by respondent but now asserted by petitioner to be excessive; and the valuation of 124 shares of Tyson & Davis, Inc., returned at a value of $250, and increased by respondent to $300 per share. Some of the facts have been stipulated. Findings of Fact The stipulated facts are hereby found. Petitioner is the executrix under the will of her late husband, the decedent, who died at the age of 67 on December 20, 1940. The estate tax return was filed in December, 1941, with the collector of internal revenue for the district of Georgia. Under date of January 2, 1927, decedent and his wife, as successor trustee, executed an instrument, whereby decedent purported to convey to himself as "trustee" an 80 percent interest in the following properties, the remaining 20 percent being reserved to himself individually: 205 shares of the capital stock of Noma Naval Stores Company, an Alabama corporation. 10 shares of Farmers National Bank, of Geneva, Alabama. 100 shares of the capital stock of Winter Hardware Company, an Alabama corporation. 3/8th interest or equity in Eastman Turpentine Company, of Eastman, Ga., a partnership. 1/4th interest or equity in *16 Sellers, Davis & Company, of Rentz, Ga., a partnership. 1/3rd interest or equity in Sellers Turpentine Company of Leslie, Ga., a partnership. 1/4th interest or equity in J. B. Davis & Company of Camilla, Ga., a partnership. 2/3rds interest or equity in Newton Turpentine Company of Newton, Ga., a partnership. $4,000 Mortgage note given by W. J. Boles, of Hacoda, Ala. $2,910.37 Account receivable of W. J. Boles of Hacoda, Ala.
$12,700.00 Secured notes of W. N. Morris, due serially dated 7/1/26. $2,551.52 Secured notes of W. N. Morris, due serially dated 7/1/26. $10,000.00 Mortgage note given by J. S. Shaw, Atlanta, Ga., dated 1/1/27. Residence and furnishings in city of Albany, Ga.
Briarcliff Manor Apartment in city of Atlanta. Ga. Although not mentioned in the instrument, decedent's interest in the partnership of Tyson & Davis, which was later incorporated, was treated in the same manner as the aforementioned properties. Decedent's wife and his four children were designated as equal "beneficiaries." There was to be distributed to them annually the "net income" derived from the 80 percent interest in the aforementioned properties. "Net income" was defined as *17 * * * all profits derived from said TRUST property, proceeds, funds and assets left after deducting (a) all expenses incurred in the administration of the TRUST hereby created, (b) all amounts owing by said J. B. DAVIS, under the terms, conditions, agreements and covenants of any agreements executed by said J. B. DAVIS and being in effect at the date of execution of this Indenture, (e) compensation to said J. B. DAVIS, as TRUSTEE, for his services hereunder, which is hereby fixed at the sum of not more than five thousand ($5,000.00) per annum, (the amount of said compensation to be determined each year by said TRUSTEE, * * * Other provisions in the instrument concerned with the "beneficiaries" interests were: 10. Upon the death of any of said beneficiaries, the TRUSTEE may, in his discretion, at any time thereafter, dispose of the interest of such deceased beneficiary in the TRUST property then remaining in him and distribute, deliver and pay the same, as appointed and directed by the last will and testament of the deceased beneficiary, if he shall have died testate, or, in default of such appointment or direction by the last will and testament of the deceased beneficiary, to *18 such person or persons as shall be entitled thereto, as the heirs at law and distributees, of such deceased beneficiary, under the laws of the state of which such deceased beneficiary shall be a citizen at the time of his or her death, and be discharged from the TRUSTS hereby created and declared, or the TRUSTEE may continued to hold and administer such interest, under the TRUST hereby created and declared, as absolutely as if such beneficiary had not deceased, for the benefit of his or her heirs at law and distributees according to their respective interests therein, as determined by the laws of the state of which such deceased beneficiary was a citizen at the time of his or her decease. 11. The TRUSTEE may, in his discretion, at any time, grant, convey, assign, transfer and deliver, to any one or more of said beneficiaries, his or her or their respective interest or interests in the property comprised in this TRUST then remaining, so that the same may be held and owned by such beneficiary, or beneficiaries absolutely as his or her, or their property, wholly freed of and discharged from the TRUSTS hereby created and declared, and, in any event, at the expiration of the fifteen (15) *19 years from the date of the decease of said J. B. DAVIS, the TRUSTS hereby created shall wholly cease and determine, and the property comprised in the TRUST, then remaining shall be delivered to and belong to said beneficiaries, their heirs or legal representative as fully and completely and absolutely as if this Indenture had never been made, nor this TRUST created and declared, according to their respective interests therein. Decedent retained the following powers and control: (1)To manage and control all of the properties and the proceeds thereof including unrestricted power of sale, in his own name or as "trustee"; (2) To borrow money and to secure such loans; (3) To purchase property upon such terms and at such prices as he should deem to the advantage of the "trust estate"; (4) To vote all stock; (5) "To use all of said TRUST ESTATE, or any part thereof, in all business transactions of any and every kind, in such way and manner as the TRUSTEE shall deem best and as he shall deem proper for the purposes of the ESTATE and for the advantage of the ESTATE, the said TRUSTEE to have and enjoy, in that behalf, all and singular, the powers of disposition of said TRUST PROPERTY *20 that he would have and enjoy if he owned the same absolutely in his own right, the intention hereof being that the TRUSTEE shall have all the powers and privileges which he now enjoys and which he may deem necessary to manage, invest and re-invest said TRUST PROPERTY, in such manner as he shall deem most advantageous, and to the end that there may be absolutely no limitation upon his powers and privileges in that regard"; (6) To pay all State, county, municipal, and Federal taxes, including income and inheritance taxes which he may regard as proper charges upon such properties, to settle claims and "generally to deal with said TRUST ESTATE in the same manner, and with the same powers as if the same belonged to him absolutely, and in that behalf to execute and deliver any deed, release, conveyance, contract, bond, note or other instrument in writing, that he may deem necessary or proper, either in his own name, or in his name as TRUSTEE for any or all of said beneficiaries, or in the name of any or all of said beneficiaries by him as TRUSTEE." By the terms of the instrument, decedent was obliged to keep books of account in which were to be "set down all transactions had on account *21 of said TRUST ESTATE * * *," and in his discretion, was to render annual accountings. Successor trustees were required to render such accountings. "So far as practicable, the property and assets of the Trust * * * [were to] be kept separate and distinct from the individual property * * *" of the decedent, but all of the properties could be kept in his name. Decedent kept no accounts with respect to the properties purportedly placed in trust, the proceeds from the disposition thereof, or the income derived. Although advised by his accountant to establish books for such purposes, decedent did not do so. No accounting was made to the persons named as beneficiaries in the instrument. Notwithstanding, decedent caused his accountant to prepare fiduciary returns with respect to certain trust income and also individual tax returns for himself and for each of the beneficiaries named in the instrument. Income taxes shown to be due by them were paid by decedent. None of the books of original entry of the businesses mentioned in the instrument contained any reterence to the trust. The only books which made reference to the trust were the ledgers of J. B. Davis & Company; the ledger of *22 Sellers, Davis & Company, the word "trustee" having been subsequently added to decedent's name; the ledger of Eastman Turpentine Company, the word "trustee" there also having been subsequently added to decedent's name. When J. B. Davis was incorporated, certificates were issued in decedent's name, and the word "trustee" was later added to the stubs in the stock certificate book. On tax returns prepared for the various corporations decedent and not the trust was shown as the owner of the stock interests. In the estate tax return the following properties were listed as owned by "J. B. Davis, Trustee," it being further specified that decedent owned a 20 percent interest: 1. 375 Shares of Common Stock of
J. B. Davis & Co., Inc., Ca-
milla, Ga., having a par value
of $100.00 per share, valued at
$350.00 per share
$131,250.00
2. 124 Shares of Common Stock of
Tyson & Davis, Inc., Camilla,
Ga., having a par value of
$100.00 per share, valued at
$250.00 per share
31,000.00
3. 69 Shares of Common Stock of
City National Bank, Albany,
Ga., having a par value of
$100.00 per share, valued at
$150.00 per share
10,350.00
4. Briar Cliff Apartment Building
located in the City of Atlanta,
Georgia, valued at $40,000.00,
subject to a first mortgage of
$21,000.00
19,000.00
5. Note of Leon Ernst due 9-9-41
1,500.00
Total
$193,100.00
*23 No accurate reconciliation appears which would account for the differences between the properties mentioned in the instrument and the properties on hand at the time of decedent's death. There is no record regarding Noma Naval Stores Company. Farmers National Bank and Winter Hardware Company went out of existence. Eastman Turpentine Company was dissolved in 1936. There is no record of the proceeds of the liquidation. During 1927 there was distributed to decedent $4,483.87, there being no record of its disposition. Sellers, Davis & Company disposed of its inventories at a loss, sometime after 1931. J. B. Davis & Company was incorporated in 1936. Thereafter dividends were paid to decedent which he donated back to the corporation. Newton Turpentine Company was absorbed by J. B. Davis & Company. There is no record with reference to the notes of Boles, Morris and Shaw. The residence in Albany was sold for $8,500. The household furnishings are still being used by decedent's widow. There is no record of the disposition of balances received from Briarcliff Manor which were turned over to decedent during his lifetime. The earnings of the various businesses attributed on the books to decedent *24 individually or as trustee are as follows: J. B. Davis
Sellers, Davis
Eastman
Sellers Tur-
Newton Tur-
Year
& Co.
& Co.
Turpentine Co.
pentine Co.
pentine Co.
1929
M $4,344.69 $ 8,618.52 ($ 524.00)[1]
$18,383.94
1930
($10,967.75)[1]
(5,224.14)[1]
(19,251.98)[1]
( 5,000.20)[1]
1931
( 29,835.91)[1]
(6,409.91)[1]
(19,402.56)[1]
( 4,385.54)[1]
1932
1,075.38 ( 6,517.36)[1]
( 1,769.02)[1]
1933
18,783.99 ( 122.81)[1]
( 5,482.56)[1] (A)
1934
16,888.28 4,204.82 1935
8,917.54 (X) 24,309.68 1936
1937
1938
1939
1940
Totals
$ 4,861.53 ($7,289.36)[1]
($8,161.69)[1]
($17,161.32)[1]
$18,383.94
Tyson &
Year
Davis
Totals
1929
$2,431.78
* $33,254.93
1930
8,415.23
(32,028.84)[1]
1931
1,883.92
(58,150.00)[1]
1932
342.95
( 6,868.05)[1]
1933
(2,709.93)[1]
10,468.69
1934
(2,314.24)[1]
18,778.86
1935
M
** 33,227.22
1936
7,477.56
7,477.56
1937
8,319.81
8,319.81
1938
2,810.05
2,810.05
1939
1,905.06
1,905.06
1940
4,908.02
4,908.02
Totals
$33,470.21
$24,103.31
*25 On March 2, 1928, decedent executed his will, disposing of his estate to his widow. At the time of the execution of the instrument in 1927, decedent's widow suspected that decedent was suffering from a heart condition, but it was not until 1939 that decedent submitted to physical examinations, at which time he was advised that he had heart trouble. The cause of his death was heart trouble. Decedent's accountant, who was familiar with the fiscal matters relating to J. B. Davis & Company, was of the opinion that stock of the corporation, at the time of decedent's death, had a value of $350 per share, and so reported in the estate tax return which he prepared for petitoner's signature. Respondent has accepted this valuation, petitioner now contending that the fair market value of the stock did not exceed $250 per share. By increasing the value of certain timber owned by the corporation from $2 per thousand to $5.50 per thousand, respondent arrived at a figure for each share of stock slightly in excess of $350. The increase in value of timber to $5.50 was based on a review of the audit reports of Tyson & Davis, Inc., which reflected purchases of timber by that corporation during *26 the period October-December, 1940, at an average price of $5.80 per thousand. Respondent increased the value of the stock of Tyson & Davis, Inc., to $300 per share by capitalizing the earnings of the business at 14 1/2 percent. The earnings and expenses of Tyson & Davis from 1936 to 1940 are as follows: STATEMENT OF EARNINGS AND EXPENSES January 1, 1936, to December 31, 1940 Partnership
Corporation
1-1-40 to
7-1-40 to
Explanation
1936
1937
1938
1939
6-30-40
12-31-40
EARNINGS: Net Sales
$89,705.17
$106,377.29
$72,006.20
$85,210.21
$63,946.25
$67,110.24
Cost of Sales
67,309.42
83,035.05
58,596.85
71,890.90
47,348.60
49,738.50
Gross Profits on Sales
22,395.75
23,342.24
13,409.35
13,319.31
16,597.65
17,371.74
OTHER EARNINGS:
3,765.04
5,121.16
4,246.82
3,781.64
1,327.71
1,577.21
Total Earnings
26,160.79
28,463.40
17,656.17
17,100.95
17,925.36
18,948.95
EXPENSES: Executive Salaries
2,400.00
2,400.00
2,400.00
2,400.00
1,200.00
9,000.00
Other Expenses
5,346.35
6,372.80
6,352.19
7,733.95
3,933.67
3,706.02
Total Expenses
7,746.35
8,772.80
8,752.19
10,133.95
5.133,67
12,706.02
Profit on Operations
18,414.44
19,690.60
8,903.98
6,967.00
12,791.69
6,242.93
DEDUCTIONS FROM
INCOME
3,459.33
3,050.97
3,283.88
3,156.88
2,975.64
2,899.30
Earnings before
Income Taxes
14,955.01
16,639.63
5,620.10
3,810.12
9,816.05
3,343.63
*27 The value of the 375 shares of J. B. Davis & Co., Inc., at date of decedent's death was $131,250; the value of 124 shares of Tyson & Davis, Inc., $37,200. Opinion Subsequent to the hearing in this proceeding, the case of Commissioner v. Holmes was decided by the Supreme Court. . We think the disposition of this proceeding in favor of respondent is compelled by that authority which it closely resembles. Since the transfer in question took place in 1927, the provisions of section 811(d)(2), as added in 1936, must be applied. Even so, "the power 'to alter, amend, or revoke' specified in § 811 (d) (2)" includes "a power to terminate contingencies which accelerate enjoyment, with the effect of making certain that the beneficiary taking will have it rather than others to whom it would or might inure if termination were longer deferred." Commissioner v. Holmes, supra, 486. When the present decedent reserved to himself the power "at any time, [to] grant * * * to any one or more of said beneficiaries, his * * * respective interest or interests in the property comprised in this TRUST then remaining," he did, as did the decedent in the Holmes case, reserve *28 such a power to terminate. Petitioner's effort to distinguish that case on the ground of the quality of the estates respectively reserved to the beneficiaries seems to us unavailing. There, with respect to the interest of any deceased beneficiary, * * * Generally stated, the scheme was that the surviving issue of each son should take his share of the corpus, receiving it share and share alike, unconditionally if over 21; as beneficiaries until attaining that age, if under it. If a son should die without issue, his "share or trust" was to go "pro rata" to the other two sons, or their surviving issue per stirpes; if either son should be deceased without issue, the survivor or his issue was to take the whole; and if all the sons should be deceased without issue, whatever might remain in the trust estate was given to the grantor's wife, if living; if not, to their heirs at law. [Commissioner v. Holmes, supra, 484-485]. Whereas here, Upon the death of any of said beneficiaries, the TRUSTEE may, in his discretion * * * pay the same, as appointed and directed by the last will and testament of the deceased beneficiary * * * or in default of such appointment or direction * * * to such *29 person or persons as shall be entitled thereto, as the heirs at law and distributees, of such deceased beneficiary * * * or the TRUSTEE may continue to hold and administer such interest, under the TRUST hereby created and declared, as absolutely as if such beneficiary had not deceased, for the benefit of his or her heirs at law and distributees * * *. The power of choice residing in the decedent here by virtue of his option to terminate was thus, if anything, greater than that possessed by the grantor in the Holmes case. He could equally here, if he chose, at least select between a living beneficiary and his possible heirs or issue. That is sufficient to place the present proceeding squarely parallel with Commissioner v. Holmes, supra, and to require approval of respondent's determination on this point. In spite of possibly overemphatic urgings at the hearing, petitioner produced no evidence whatever to cast doubt on the correctness of respondent's determinations of value as to the two blocks of corporate stock which are in controversy, nor incidentally to raise any question in the case of one of them as to the correctness of the executrix's own original valuation which respondent *30 has adopted. If anything, the record as a whole tends to support affirmatively the determinations of value. On this issue also respondent is sustained. Decision will be entered for the respondent. Footnotes
M. Report Missing. ↩
1. n( ) Indicates loss. ↩
A. Loss on uncollectible account of E. E. Sellers [a partner]. ↩
X. Includes Profit of $16,920.92 on sale of property. ↩
*. Excludes J. B. Davis & Co. ↩
**. Excludes Tyson & Davis.↩